JSL

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | **WILLIAM T. HART** | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **98 C 1850** | **DATE** | **AUG. 25, 2000** |
| **CASE TITLE** | **AMANDA HEBEIN, etc., et al. vs. JACKIE YOUNG, etc., et al.** | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiffs' motion for partial summary judgment [114-1] is denied. CCPD defendants' [117-1] and DCFS defendants' [118-1] motions for summary judgment are granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs (1) dismissing the Count II claim against Hall, the Count IV findings claim, and all supplemental state law claims without prejudice for lack of subject matter jurisdiction and (2) dismissing the remainder of plaintiffs' causes of action with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 2 9 2000 | |
| | Notified counsel by telephone. | | date docketed | 147 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 8/25/2000 | |
| | | | date mailed notice | |
| WJS | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 00 AUG 28 AM 8:40 | mqm mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMANDA HEBEIN, a minor, by )
her next friend Pilar Berman, )
PILAR BERMAN and NORMAN BERMAN, )
                                )
            Plaintiffs,         )
                                )
      v.                        )     No. 98 C 1850
                                )
JACKIE YOUNG, an employee of the )
Illinois Department of Children )
and Family Services, in his     )
individual capacity, by his     )
representative, Bruce Boyer,    )
Special Administrator of the    )
Estate of Jackie Young,         )
et al.,                         )
                                )
            Defendants.         )

## MEMORANDUM OPINION AND ORDER

This case involves a dispute regarding custody of a
four-year-old girl. On October 11, 1996, possible physical abuse
was reported by a day care worker which resulted in the girl
being placed in the custody of her grandparents for approximately
eight months. Plaintiffs complain that employees of the state's
child welfare agency and a local police department, as well as
the grandparents, acted wrongfully in separating the girl from
her mother and stepfather.

Plaintiffs in this case are Amanda Hebein,[1] her mother Pilar Berman, and Norman Berman.  Norman is the husband of Pilar and acted as a stepfather of Amanda.  During the times relevant to this case, Norman had no legal right to custody of Amanda; the parental rights in question are Pilar's right to custody or a relationship with Amanda.  Named as defendants are four employees of the Illinois Department of Children and Family Services ("DCFS") and four employees of the Calumet City Police Department ("CCPD").  Also named as defendants are Reno Boe and Anita Boe, Pilar's parents.[2]  The DCFS defendants are Jackie Young,[3] an investigator in the Division of Child Protection ("DCP"); Sandy Threatt, a DCP lead investigator who was Young's immediate supervisor; Veronica Edmonds, a DCP investigator; and Roy Hall, a social worker responsible for "follow-up" work after the initial investigation by DCP employees.  The CCPD defendants are Walter Bergstrom, Timothy Murphy, Ronald Hanrahan, and Paul Ritchie. The state defendants are sued in their individual capacities only.  Presently pending are motions for summary judgment by the

---

[1]The claims on behalf of Amanda are brought by her next friend Pilar Berman.  For simplicity in presentation, Amanda will be referred to as one of the plaintiffs.

[2]The DCFS and CCPD defendants, that is the defendants other than the Boes, will be referred to collectively as the state defendants.  The Bermans and Boes, as well as Amanda, will each be referred to by their first names.

[3]Subsequent to the filing of this lawsuit, Young died. Bruce Boyer was appointed as the special administrator of Young's estate.

state defendants and plaintiffs' motion for partial summary judgment of liability as to two claims.

The original complaint contained eight counts. In ruling on defendants' motions to dismiss, some of the counts were dismissed in part. See Hebein v. Young, 37 F. Supp. 2d 1035 (N.D. Ill. 1998) ("Hebein I"). Plaintiffs subsequently amended the complaint to add a ninth count. The pending claims are as follows. Count I is labeled as a "42 U.S.C. § 1983 claim for violation of Fourth Amendment right not to be subject to unreasonable seizures." Count I is brought by Amanda against DCFS defendant Edmonds and all four CCPD defendants. Amanda claims that taking her from her mother's home was without any rational or reasonable basis. Count II is labeled as a "42 U.S.C. § 1983 claim for violation of substantive due process rights of minor not to be placed in a dangerous environment by state officials, and to be protected from harm when state officials have taken her into custody against her will and restrained her liberty." Count II is brought by Amanda against three of the DCFS defendants, Young, Threatt, and Hall. Amanda claims defendants knew or suspected that being placed with the Boes would be dangerous to her. Count III is labeled as a "42 U.S.C. § 1983 claim for violation of substantive due process rights to family association, family autonomy, family integrity, and family privacy." Count III is brought by Amanda and Pilar against all ten defendants. Plaintiffs claim defendants lacked a rational or reasonable basis for depriving plaintiffs of their

rights. Count IV is labeled as a "42 U.S.C. § 1983 claim for violation of procedural due process rights." Count IV is brought by Amanda and Pilar against DCFS defendants Young and Threatt. Both Amanda and Pilar complain about defendants taking over two months to initiate a judicial hearing (the "delay" claim). Count IV also contains a claim by Pilar that registering an indicated finding (of abuse of Amanda by Pilar) on Illinois's Central Register constituted a violation of procedural due process (the "findings" claim). Counts V through IX are supplemental state law claims against the Boes. The only supplemental claim that is a subject of the pending motions is the Count IX claim by Amanda for battery. She alleges the Boes committed battery by subjecting her to an intrusive gynecological examination in the hopes of finding medical evidence that Norman had sexually abused Amanda.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Baron v. City of Highland Park, 195 F.3d 333, 337-38 (7th Cir. 1999). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999); Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which the nonmovant will bear

the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Shank v. William R. Hague, Inc.</u>, 192 F.3d 675, 681 (7th Cir. 1999); <u>Wintz v. Northrop Corp.</u>, 110 F.3d 508, 512 (7th Cir. 1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. <u>Celotex</u>, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. <u>See NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>id.</u> at 325 ("the burden on the moving party may be discharged by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. <u>Id.</u> at 324. The non-moving party cannot rest on the pleadings

alone, but must designate specific facts in
affidavits, depositions, answers to
interrogatories or admissions that establish that
there is a genuine triable issue. Id. The
non-moving party "must do more than simply show
that there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 586 (1986).
"The mere existence of a scintilla of evidence in
support of the [non-moving party's] position will
be insufficient; there must be evidence on which
the jury could reasonably find for the
[non-moving party]." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 252 (1986).

Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

Furthermore, pursuant to Local Rule 56.1(a)(3), the

party moving for summary judgment is required to provide a

statement of material facts as to which the moving party contends

there is no genuine issue. The statement is to be in the form of

numbered paragraphs. The nonmovant is to respond to each

paragraph, either admitting it is uncontested or stating the

nonmovant's disagreement and specifically citing to supporting

materials showing there is a genuine factual dispute. Loc. R.

56.1(b)(3)(A). The nonmovant is also to provide a statement of

additional facts, if any, that would defeat summary judgment,

again in the form of numbered paragraphs with supporting

citations. Loc. R. 56.1(b)(3)(B). "All material facts set forth

in the statement required of the moving party will be deemed to

be admitted unless controverted by the statement of the opposing

party." Id. Similarly, "[i]f additional material facts are

submitted by the opposing party pursuant to section (b), the

moving party may submit a concise reply in the form prescribed in

that section for a response. All material facts set forth in the statement filed pursuant to section (b)(3)(B) will be deemed admitted unless controverted by the statement of the moving party." Id. 56.1(a).

Defendants' motions for summary judgment will be considered first. Defendants were provided an opportunity to file a reply. The CCPD defendants did not file a reply. The DCFS defendants filed a reply, including a response to plaintiffs' Rule 56.1(b) statement. The DCFS defendants limit their factual objections to a limited number of paragraphs in plaintiffs' statement.[4] Except for those limited objections that must be considered, plaintiffs' Rule 56.1(b) statements will be deemed to be admitted. Accepting the deemed admissions and resolving all genuine factual disputes and drawing all reasonable inferences in plaintiffs' favor, the facts assumed to be true for purposes of defendants' motions for summary judgment are as follows.

Amanda was born on December 23, 1992. In 1994, she was diagnosed as having cerebral palsy. As of age two, Amanda was not able to walk on her own, her speech was limited, and her grasping and motor skills were not developed. At age three, she was more developed, but still behind for her age. As of March 1996, Amanda's speech continued to be seriously delayed and she

_____

[4]The DCFS defendants represent that additional factual assertions of plaintiffs are in error or unsupported, but defendants do not specifically raise these objections because, according to defendants, these facts are not material to their summary judgment motion.

had a limited vocabulary. An assessment was performed in April
1997, at which point Amanda was four years and four months old.
As of that time, her auditory comprehension and oral expression
were three years and one month, and her total language score was
three years and two months. This was described as "moderately
severe" speech delay and it was reported that it was difficult to
carry on a conversation with Amanda. It was also reported that
"she responded to verbal initiation in a tangential fashion or
made contradictions of statements she had just said."

Pilar is Amanda's mother. Pilar and Amanda's father were
divorced in July 1995. Pilar and Norman were married May 18,
1996. Norman has not adopted Amanda, but he has been involved
with her care since mid-1995. Anita and Reno are Pilar's
parents. The Bermans lived in a house owned by the Boes. From
Amanda's birth until March 1996, Anita cared for Amanda while
Pilar worked and Anita also occasionally babysat on weekends and
evenings. Until December 1995, Pilar and her parents did not
have significant disagreements regarding Amanda's care. At that
point, disputes arose and, effective April 1, 1996, Pilar
enrolled Amanda in day care at Tiny Town. Pilar had no contact
with her parents from March 26, 1996 until September 1996. On
March 26, 1996, the Boes took Amanda to the CCPD and Reno
reported that Norman had physically abused Amanda. DCFS
determined the report of abuse was "unfounded" and later
determined that it was "harassing." On May 17, 1996, DCFS

informed the Bermans no action would be taken on the reported charges.

Tiny Town is a nursery school owned by Cynthia Tortolano. Glorimar Guadalupe ("Lali") has been the director of Tiny Town since 1993. Initially, Lali was Amanda's teacher. However, when Amanda moved to the upstairs class in the fall, Melissa Knish became Amanda's primary caretaker. Under both Tiny Town's rules and state law, see 325 ILCS 5/4, Tiny Town's director and teachers were required to report suspected abuse. Tiny Town also had a practice of noting any significant injuries, whether related to abuse or not, on an unusual incident form. Four such forms were completed regarding Amanda, but not on October 11, 1996. Lali did not like the way Norman looked and was suspicious of him from when she first met him.

Lali was aware that Amanda would fall and injure herself and that this would cause bruising. While Amanda was under her care, Lali would assist her in going to the bathroom and would notice bruises. On July 5, 1996, Lali reported bruises to DCFS. She thought these were not normal because the bruises were in a line, not a circle, and looked to Lali like they were caused by a belt. DCFS investigated and determined that the report of abuse was unfounded. Plaintiffs concede that Lali's July 5 report was not intentionally false nor intended to be harassing. Lali was upset that her reported accusation was determined to be unfounded.

The report of abuse that began the sequence of events that underlie this lawsuit occurred on October 11, 1996. At 6:30 a.m. that day, Norman dropped Amanda off at Tiny Town. At approximately 3:30 p.m., Amanda wet herself and then began crying. Lali tried to comfort her and Amanda said, "I'm sorry. I'm sorry." When Lali lifted Amanda to hug her, Amanda said, "No, no, no, no. Don't. Don't hit." Lali told her she was not going to hit her, and Amanda said "No, no, Norman," which Lali understood to mean she should not tell Norman about the wetting. Amanda continued to cry and, at some point, said the word "belt."[5] When Amanda continued to say "No, no, Norman," Lali asked her "what" about Norman and Amanda said, "No hit, no hit." Lali understood this as meaning Norman had previously hit Amanda.

According to Lali, she observed bruises when cleaning Amanda following the wetting. Lali reported to DCFS and, at her deposition, testified there were four bruises (not welts) and they were approximately two inches wide and one was about four to five inches long. Knish assisted Lali in cleaning Amanda. Knish testified that there was a mark approximately five inches long.[6]

---

[5]Plaintiffs contend that Amanda cannot be assumed to have actually said the word "belt" because it was not in her vocabulary at the time. However, the evidence they point to (see Pl. Stmt. Additional Facts ¶ 17; Norman Dep. 54) only supports that Amanda did not have a belt of her own, not that it was a word outside her vocabulary.

[6]Knish also testified that Amanda said Norman took the belt off his pants and hit her, although this statement may be inconsistent with evidence regarding Amanda's language abilities.

Lali also called Tortolano to observe the marks.  Tortolano described the bruises as numerous and circular.  When Tortolano asked Amanda about the bruises, Amanda responded that she fell. Tortolano agreed with Lali that DCFS should be contacted.

Sergeant Murphy testified the bruises were four or five purplish welts that he believed were strap marks, about an inch to two inches in width and five to twelve inches long.  Officer Hanrahan testified there were six to eight marks, four to eight inches in length, brownish and purplish, and a little puffy. Sergeant Bergstrom testified he saw four to five purplish welts that were eight to ten inches long and not fresh.  Bergstrom thought the marks were too thin to have been caused by a belt. Anita testified there were three red bruises on Amanda's back and red bruises in Amanda's vaginal area.  Reno testified there were five, one-inch wide red welts and that one was two feet long, going from Amanda's heart across her genitals and ending on her right leg.  The first DCFS employee to examine Amanda was Young, and that examination did not occur until October 30.  At that time there was still evidence of prior bruising.  No contemporary photographs or x-rays were taken nor was Amanda taken for a medical examination.  Also, no one at Tiny Town noticed any suspicious bruises during the first nine hours that Amanda was at Tiny Town, despite the fact that Tiny Town staff assisted her in dressing and undressing, particularly when she want to the bathroom, which was usually once an hour or more often.

In light of differing descriptions of the bruises, the
failure of any Tiny Town employee to notice the bruises earlier
in the day, and the lack of photographs or a medical examination,
plaintiffs contend there is a genuine factual dispute as to
whether Amanda had any bruises that would have been indicative of
physical abuse. However, there is no testimony from anyone that
Amanda did not have the bruises.[7] While the descriptions are not
exactly the same, this comes as no surprise when seven different
people[8] are attempting to recall precise descriptions. While the
precise details may differ, all seven testified that they
believed the bruises were consistent with physical abuse. While
the police officers and Anita (all of whom have been sued) have
an interest in showing such bruises were present, the three day
care workers are not named as defendants and therefore would not
have an incentive to exaggerate or fabricate. Plaintiffs point
to evidence that Lali was biased against Norman, but they point
to no evidence that Knish or Tortolano had any bias or any reason
to fabricate. Even taking into account the lack of any
corroborating medical or photographic evidence and the delay in
discovering the bruises, where there is no contrary evidence of a
lack of bruises, a reasonable trier of fact could not reject the
testimony of seven witnesses that Amanda had bruises that

---

[7]Pilar saw Amanda on October 13. She lifted Amanda's
shirt, but does not recall what she saw. She did not pull down
Amanda's pants or otherwise examine her.

[8]Other evidence supports that Reno's statements about
abuse are not credible. His description is not being credited.

appeared to have been caused by another person. Moreover, on June 17, 1997, during the custody proceedings, Pilar stipulated that "(1) On October 11, 1996, two child care workers at Tiny Town Child Care Center observed marks and bruises on Amanda's buttocks. (2) Amanda has cerebral palsy and epilepsy. (3) DCFS investigator Jackie Young interviewed Amanda for the first time on October 30, 1996. Amanda at that time was placed with Anita and Reno Boes. (4) In answer to questions, Amanda stated that a 'belt' or 'buckle' did 'this' to her." There is no genuine factual dispute that Amanda had bruises that a person could reasonably believe were the result of physical abuse.

During the morning of October 11, Pilar had arranged to have her mother pick up Amanda from Tiny Town and babysit that evening. When the Boes arrived to pick Amanda up, Lali showed Anita the alleged marks. Reno Boe then dropped off Amanda and Anita at the Bermans' residence as had been planned.

DCFS defendant Edmonds had been a child protective investigator since approximately December 1992. As such, her duties included assessing the safety of minor children. Upon receiving a hotline call about alleged abuse, the investigator is to make an assessment as to whether the child is safe at the time of the interview, complete paperwork, and take protective custody of children when appropriate. The child is supposed to be seen within 24 hours. If the child is placed with a relative, an assessment of the safety of the new home is to be made at the time of the placement.

Edmonds received a report ("CANTS1") of the hotline call regarding Amanda. The report described the bruises as one bruise below Amanda's butt cheek, three bruises on her back, and three scratches on the back of her waist. It also reports that Amanda stated the bruise below the butt check was from Norman hitting her with a belt. The report also stated that a different teacher reported seeing a bigger bruise the prior week. The report additionally noted that Amanda had cerebral palsy. At the time Edmonds received the CANTS1, there were not enough investigators available to handle all the calls that had been received. The call about Amanda was deemed to be less of an emergency than others and Edmonds asked the CCPD to investigate, which is a permitted procedure under DCFS's rules.

Approximately 7:00 p.m., Sergeant Murphy and Officer Hanrahan arrived at the Berman residence. Anita let them into the home and Murphy informed her that they had received a report that a child had been beaten by her stepfather. However, that evening, no CCPD officer interviewed any Tiny Town employee regarding Amanda's reported identification of Norman as causing one of the bruises. At the time the officers arrived, Amanda was watching television and did not appear to be in pain. The officers did not ask Anita where Amanda had been all day nor whether she had received any medical treatment. Murphy asked Amanda leading questions regarding Norman hitting her with a belt and otherwise abusing her and she responded, "Yes." Murphy did not attempt to determine what prior questioning had been done

with Amanda. Within ten minutes, Murphy and Hanrahan decided to take Amanda into temporary protective custody. They did not arrange for a medical examination and made no attempt to discover any prior history of abuse reports regarding Amanda or criminal reports regarding the Bermans or Boes. Their determination to take Amanda into custody was based entirely on the limited information in the CANTS1, their examination of the bruises, that Amanda needed dental work, and their leading questioning of a girl who was less than four years old with speech deficiencies.

At 8:15 p.m., CCPD defendant Murphy reported back to Edmonds. At that time, Amanda was already in temporary protective custody at the police station. Murphy reported to Edmonds that Amanda appeared to have been abused, but he reported that she had welts, not bruises. However, Murphy did not report where the welts were located, the number or welts, nor the size or color of the welts. At the police station, Amanda was questioned by additional officers, including Bergstrom who was a youth officer, but no attempt was made to otherwise corroborate the information the officers had. They did not contact the Tiny Town employees or the Bermans, no medical examination was conducted, and no investigation was made of Amanda's or the family's history. Murphy did speak with Reno, who informed Murphy that he had suspected Norman of previous physical abuse of Amanda. The officers also apparently obtained a limited amount of information from Anita.

Edmonds spoke to Bergstrom at approximately 9:00 p.m. He did not provide her with any additional information regarding the CCPD investigation. Bergstrom did inform Edmonds that Amanda was not in need of immediate medical attention. Bergstrom requested and received permission to place Amanda in the Boes' custody. As of that time, there was no information or evidence indicating that Pilar was an unfit or abusive parent and neither the police nor Edmonds had any information indicating that Pilar had no objection to a placement with the Boes. Edmonds testified that she did not understand this to be protective custody requiring further procedures, but she had no affirmative information that it was a consensual placement.[9] Edmonds was expecting a more thorough investigation would be conducted the next day. Edmonds testified that, had she known Pilar would object to a placement with the Boes, she would have instead placed Amanda directly with DCFS. Edmonds's duties with the case ended that evening, with Young being assigned the initial investigation the next day.

Following Bergstrom's conversation with Edmonds, The CCPD officers told Anita to take Amanda home and not let Pilar have her back. They also advised her that DCFS would send out an investigator within 24 hours. The Boes did not speak with any DCFS employee that evening and no investigation was conducted to

---

[9]Neither was Edmonds informed that Pilar specifically objected to the placement. As of 9:00 p.m., Pilar had not yet been contacted by anyone regarding the situation and did not even yet know that an investigation of accusations was underway.

determine if the Boes were appropriate caretakers who would provide a safe environment.

The Bermans arrived home between 10:00 and 11:00 p.m. on October 11, the time Pilar had told Anita they would be home. Amanda and Anita were not there and there was a message on the answering machine to call the CCPD. Instead, Pilar called Anita who told Pilar she should contact the CCPD because Norman had been accused of beating Amanda. Pilar told Anita she would instead come to the Boes and Anita warned her she would call the Lansing police if she did.[10] When the Bermans arrived at the Boes, Lansing police officers were there who prevented the Bermans from going into the Boe residence and instead advised the Bermans to go to the CCPD. The Bermans were not informed that Tiny Town had initiated an abuse charge. Instead, they assumed that Reno had.

The Bermans arrived at the CCPD around midnight. The Bermans were briefly questioned and Officer Ritchie inaccurately reported to them that Amanda's teeth and toes were broken. Within a short period of time, Norman was arrested and charged with domestic abuse. Pilar still was not specifically informed regarding Amanda's injuries. She was told that there had been a hotline call to DCFS, that marks on Amanda had been observed, and that Amanda had been placed with the Boes. No CCPD officer specifically told Pilar she was not permitted to see Amanda, but

---

[10]The Boes lived in Lansing, Illinois.

the Lansing police had previously prevented her from seeing Amanda at the Boes' residence.

Norman was arraigned during the morning of October 12 and released under a protective order that he understood as prohibiting him from having contact with Amanda. The judge instructed Norman that he could not be in the house with Amanda and Pilar understood this to mean Norman could not reside in the same house as Amanda.

Young met with Pilar around noon on October 12. Pilar told him she did not know anything about the alleged bruises on Amanda. Young was not on duty October 13 through 15. He was assigned the formal investigation on October 16.[11] Neither Young nor any other DCFS employee told Pilar she was not permitted to see Amanda while the investigation was ongoing. The Boes, however, generally prevented Pilar from seeing Amanda. Young did not meet with Amanda until 19 days after the original incident, which is contrary to DCFS's standard practices. In the middle of November, Young informed Pilar that he was planning to make a finding of abuse.

DCFS defendant Threatt was Young's supervisor during the times pertinent to this lawsuit. Another employee supervised Young during his regular weekend hours. Threatt recognized that Young's contact with Amanda was delayed and she specifically ordered him to see her. Threatt concurred in Young's finding of

---

[11]DCFS distinguishes between an "initial" investigation and the subsequent "formal" investigation.

abuse. Threatt was informed by Young that he believed Norman had abused Amanda and that he believed Amanda was not at risk with the Boes. However, Young never found additional information to support that Norman had abused Amanda. Also, Young had been told that Reno was violent and thoroughly following up on this information would have disclosed a criminal complaint that Reno had attacked Anita.[12] Also, the DCFS investigations of the prior abuse allegations contained information indicating that Reno was a danger to Amanda. Young, however, failed to look at those records and failed to adequately investigate the accusations against Reno. Contrary to DCFS requirements, Young never completed an assessment of the placement with the Boes. Although Threatt denies having knowledge that would show there was any problem, on defendants' motion it must be inferred that Threatt knew the same information as Young and therefore would have known Young was not conducting an adequate investigation.

On December 19, 1996, a request for an abuse or neglect petition was initiated, pursuant to Threatt's direction that Young screen Amanda's case. Threatt's responsibility for Amanda's case ended on December 27 when the case was sent to follow-up.[13]

---

[12]On November 20, 1996, Young did check for convictions and pending charges and discovered there were none. This was accurate because the prior charges, which were no longer pending, had not resulted in a conviction.

[13]Although plaintiffs admit in ¶ 198 of their Local Rule 56.1(b)(3)(A) statement (responding to the DCFS defendants) that Threatt's responsibilities ended on December 27, they contend in their answer brief that Threatt is responsible for the

On December 23, 1996, Pilar, Norman, Amanda, and the Boes appeared in state juvenile court for a custody hearing. Pilar, Young, and the guardian ad litem (appointed in separate custody proceedings initiated by the Boes) testified. The State's Attorney, the Public Guardian, and an attorney for Pilar and Norman participated in the proceedings. Norman did not testify and Pilar did not testify concerning Amanda or otherwise dispute Young's testimony or dispute the existence of domestic violence. At the conclusion of the proceedings, the court found and ordered as follows:

> Probable cause does exist that a minor is (abused/neglected/dependent).
> The basis of the finding is: Minor sustained bruises and scratches allegedly due to being struck by step-father. Minor afraid and or uncomfortable with going home with mother and step-father.
> Immediate and urgent necessity does exist to support removal of the minor from home.

The court found that Norman and Pilar should have supervised visits and that Amanda should have frequent visits with Pilar. Pilar and Norman were to attend a series of parenting classes as a condition for the return of Amanda to their custody.

DCFS defendant Hall is a social worker. As a lead worker, he does "follow up," which includes interviewing clients, preparing service plans, and comprehensive assessment of the

___

January 14, 1997 issuance of an indicated report of abuse. See Plaintiffs' Memorandum in Opposition to the DCFS Defendants' Renewed Motion to Dismiss Counts III and IV of Plaintiffs' Complaint at 16. This inconsistency is discussed below.

delivery of services. Hall is not assigned a case until after a court has been petitioned. Hall was assigned Amanda's case on December 27, 1996, but was out of the office and did not see the case until January 5 or 6, 1997. Hall performed the first service plan and comprehensive assessment of Amanda's social history. DCFS rules require that service plans be completed within 30 days. Hall did not meet with the Bermans and prepare the plan and assessment until February 18, 1997. At that time, he told the Bermans what they would have to do to get Amanda back.

Hall set up parenting classes for the Bermans which they completed. Hall encouraged Pilar to visit Amanda, but did nothing to assist her in achieving that goal. Hall was aware the Boes were denying visitation and Hall did nothing to help Pilar overcome this obstacle. At one point, Pilar requested that Hall make a surprise visit to the Boe home, which he did. While there, he listened to Amanda talk on the telephone with Norman and Pilar. Upon hearing how comfortable Amanda was speaking to Norman, he realized that Reno's repeated statements about Norman and Amanda's fears of Norman might not be true. Hall then initiated a psychological assessment by psychotherapist Julie Norman and an "Under the Rainbow" assessment. The additional assessments, however, did not begin until April 7, 1997. Plaintiffs concede that Hall's conduct after that point aided Pilar in regaining custody of Amanda, but contend that his conduct up to that point was dilatory. Hall was involved in the

case for approximately six months before the Bermans regained custody of Amanda.

Hall and Julie Norman learned that Reno was indoctrinating Amanda against her parents. Also, in the presence of Amanda, Reno would, without solicitation, repeatedly tell investigators graphic details about claimed sexual abuse of Amanda by Norman Berman. It was also documented that Anita told Amanda her mother did not love her, an emotionally disturbing statement to make to a child. There presently is testimony indicating that Reno may have abused Amanda, but it is insufficient to conclude Reno actually did abuse her. There is evidence from an orthopedist that Amanda's condition deteriorated during her time with the Boes because of a lack of treatment, including failure to use her leg braces. At the time, however, two doctors recommended that the Boes should not be forced to put the braces on Amanda. Also, Julie Norman testified that following Amanda's return to the Bermans, Amanda suffered post-traumatic stress from having been with the Boes.

On April 24, 1997, an order of protection was entered prohibiting Reno from having any contact with Amanda, either physical or by telephone. Hall joined in urging the court to prohibit contact with Reno, but he was opposed to returning Amanda to Pilar. After the April 24 Order, Amanda remained with Anita, but Reno moved out of the house.

On June 17, 1996, another hearing was held and the court returned Amanda to the care of Pilar and Norman, under court

supervision. On November 11, 1997, Hall recommended terminating court supervision and it was terminated effective November 17, 1997. Hall considers his case plan to have been successful because the goal was to return Amanda to Pilar, which was accomplished.

The DCFS defendants argue that the Count III claim is barred by the Rooker-Feldman doctrine because it challenges the state juvenile court's December 23, 1996 determination that Amanda was abused and should be placed in the temporary legal custody of DCFS.[14] They contend that Rooker-Feldman clearly applies to conduct occurring after the state court ruling and also argue it should apply to conduct that occurred prior to the ruling. Since jurisdictional in nature, the court must sua sponte consider Rooker-Feldman's application to all claims and defendants. See 4901 Corp. v. Town of Cicero, ___ F.3d ___, 2000 WL 974388 *4 (7th Cir. July 17, 2000).

> The Rooker-Feldman doctrine "essentially precludes lower federal court jurisdiction over claims seeking review of state court judgments or over claims that are 'inextricably intertwined' with state court determinations." Remer v. Burlington Area Sch. Dist., 205 F.3d 990, 996 (7th Cir. 2000) (citing Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482 n.16 (1983)). It "is based upon recognition of the fact that inferior federal courts generally do not have the power to exercise appellate review over state court decisions." Garry [v. Geils], 82 F.3d [1362,]

---

[14]There is no specific contention principles of collateral estoppel or res judicata apply to any of the facts in this case. Therefore, any possible preclusive effect of the state court proceedings is not considered.

1365 [(7th Cir. 1996)]. Therefore, except for
situations in which Congress has specifically
authorized collateral review of state court
judgments, a party who seeks to overturn a state
court judgment must proceed through the state
judicial system and can only seek federal court
review in the United States Supreme Court
pursuant to 28 U.S.C. § 1257. See Garry, 82 F.3d
at 1365 & n.4; Young, 90 F.3d at 1230.

To determine whether Rooker-Feldman applies,
we "ask whether the federal plaintiff seeks to
set aside a state court judgment or whether he
is, in fact, presenting an independent claim."
Kamilewicz v. Bank of Boston Corp., 92 F.3d 506,
510 (7th Cir. 1996). "Put another way, if the
injury which the federal plaintiff alleges
resulted from the state court judgment itself,
then Rooker-Feldman controls, and the lower
federal courts lack jurisdiction over the claim.
It does not matter that the state court judgment
might be erroneous or even unconstitutional. Nor
does it matter that the time for appeal to the
United States Supreme Court may have passed."
Id.

4901 Corp., ___ F.3d at ___, 2000 WL 974388 at *4.

First, the Rooker-Feldman doctrine does not preclude

jurisdiction over the Count I seizure claim nor any Count III

claim for detention prior to the December 23 juvenile court

order. The juvenile court only resolved the question of who

should have temporary custody as of December 23. It reached no

conclusion as to whether it was proper to place Amanda outside

the Berman home prior to obtaining a court order, nor did it rule

as to whether proper procedures were followed for such a

placement. The allegedly improper seizure of Amanda on

October 11 and the allegedly improper placement outside the

Berman house up through December 22 were independent of and

complete prior to the entry of the December 23 court order. See

- 24 -

<u>Long v. Shorebank Development Corp.</u>, 182 F.3d 548, 556 (7th Cir. 1999). <u>Rooker-Feldman</u> does not bar any of the claims based on pre-December 23, 1996 conduct. <u>Cf.</u> <u>Carter v. Doyle</u>, 95 F. Supp. 2d 851, 856-57 (N.D. Ill. 2000) (civil rights claim based on pre-trial detention procedures does not relitigate issue of juvenile's guilt).

The Count III claim, to the extent it is based on Amanda's post-December 23 separation from her mother, is on a different footing. The juvenile court specifically awarded temporary custody of Amanda to DCFS. Therefore, ordinarily, plaintiffs would be barred from presently seeking damages based solely on Amanda being placed outside her home. A contention that Amanda should have instead been returned to the Bermans at that point would be a relitigation of an issue previously decided by the state court. <u>See</u> <u>Newman v. State of Indiana</u>, 129 F.3d 937, 942 (7th Cir. 1997) (under <u>Rooker-Feldman</u>, claim of emotional distress from being unable to adopt child is barred by state court determination that plaintiffs were not entitled to adopt the child); <u>Borum v. Bonk</u>, 2000 WL 263958 *3-4 (N.D. Ill. Feb. 29, 2000) (mother's claim that Social Services Department employees, school officials, and others conspired to deprive her of mother-child relationship and placed the child in an abusive foster care environment barred by <u>Rooker-Feldman</u> since state court custody proceedings initiated by defendants found child should be removed from home and placed with Department); <u>Johnson v. Collins</u>, 58 F. Supp. 2d 890, 898 (N.D. Ill. 1999)

(substantive due process claim that minors were improperly placed in foster care where they were abused barred by <u>Rooker-Feldman</u> because state court had ordered placement at the particular foster homes); <u>J.S. v. McDonald</u>, 1998 WL 59502 *7-8 (N.D. Ill. Feb. 9, 1998) (mother's claim that DCFS employees acted unconstitutionally in interfering with mother-child relationship barred by <u>Rooker-Feldman</u> where state court had determined father was entitled to custody); <u>Logan v. Lillie</u>, 965 F. Supp. 695, 699 n.6 (E.D. Pa. 1997), <u>aff'd by unpublished order</u>, 142 F.3d 428 (3d Cir. 1998) (collecting cases).

Young's and Threatt's involvement with Amanda's case essentially ended with the December 23 court hearing.[15] Therefore, as to Count III, it is only the claim against Hall for which there might be a lack of jurisdiction. The primary allegations against Hall are that he was dilatory in performing the assessments and other work that had to be performed before Amanda and the Bermans were reunited and that he failed to take action to ensure compliance with the court's order that Pilar was to have frequent visits with Amanda. Performing such work would have been consistent with the juvenile court's order, not

---

[15]The claim based on Young's and Threatt's participation in the December 23 hearing was previously dismissed. <u>See</u> <u>Hebein I</u>, 37 F. Supp. 2d at 1035. The Count IV findings claim against Young and Threatt is based on a finding of abuse registered on January 14, 1997. No party presents evidence as to what conduct Young and Threatt may have engaged in after December 23 in order to register that finding. In any event, any conduct after December 23 is limited to the allegations contained in the Count IV findings claim which is separately discussed below.

inconsistent with it. While Rooker-Feldman may be applied to issues that are not actually litigated as long as the issues are inextricably intertwined and there was a reasonable opportunity to raise the issue, Long, 182 F.3d at 557-58, application of Rooker-Feldman has been limited to situations where the federal suit seeks a result inconsistent with the state court proceeding, that is, a decision implying that the state court had erred. See Khal Charidim Kiryas Joel v. Village of Kiryas Joel, 935 F. Supp. 450, 455 (S.D.N.Y. 1996). Although there is no contention that Pilar could not have moved the juvenile court for further enforcement of its orders allowing visitation, a present finding that Hall failed to adequately aid Pilar in obtaining visitation would not be a finding implying that the state court's ruling was in error. Similarly, a finding that Hall was dilatory in performing his duties necessary for the reunification also would not be inconsistent with the state court rulings. The Count III claim against Hall is not barred under the Rooker-Feldman doctrine.

In Count II, Amanda complains of her placement with the Boes, which she contends was unsafe. As to the claim against Young and Threatt, their placement of Amanda with the Boes predates the December 23 court order and therefore could not be barred by Rooker-Feldman.[16] The claim against Hall, however,

---

[16]To the extent it is claimed that Young and Threatt should also be held responsible for any period of continued placement with the Boes following the December 23 hearing, as is discussed below regarding the Count II claim against Hall, that would be a challenge to the juvenile court's approval of the

concerns placement with the Boes after the December 23 hearing. Since the court approved the placement with the Boes, this claim against Hall would be barred by <u>Rooker-Feldman</u>.  <u>Cf.</u> <u>Johnson</u>, 58 F. Supp. 2d at 898.

Amanda contends[17] that, even if <u>Rooker-Feldman</u> would otherwise be applicable, it does not apply to the December 23 court order because, according to Amanda, that order was not remedial in nature and was interlocutory.  Amanda cites the statement in <u>Nesses v. Shepard</u>, 68 F.3d 1003, 1004 (7th Cir. 1995), that in order to keep <u>Rooker-Feldman</u> distinct from <u>res judicata</u>, the former "ought to be confined to cases in which the defendant in the state court is seeking to undo a remedial order of some sort (ordinarily a criminal conviction or an injunction)."  Amanda contends the December 23 order was not remedial in nature because it was not an injunction based on her wrongdoing.

A subsequent Seventh Circuit case discusses <u>Nesses</u> and the Seventh Circuit precedents it relies upon.  <u>See</u> <u>Garry</u>, 82 F.3d at 1365-68.  <u>Garry</u> states that those cases stand for the proposition that a prior plaintiff who is unsuccessful will often be subject to <u>res judicata</u> in subsequent federal litigation raising the same issues, whereas an unsuccessful defendant will often be subject to <u>Rooker-Feldman</u> in subsequent federal litigation raising the same issues.  <u>Garry</u> characterized this

_____

[17]This argument was made on behalf of both Amanda and Pilar.  However, since only Count II is presently being considered, Amanda is the only pertinent plaintiff.

rule as a "guideline" and "a helpful shorthand," but "not . . . a per se rule." <u>Garry</u>, 82 F.3d at 1367. The overriding rule is still whether "the plaintiffs' injury <u>stemmed from the state judgment</u>." <u>Id.</u> at 1366 (quoting <u>GASH Associates v. Village of Rosemont, Ill.</u>, 995 F.2d 726, 728 (7th Cir. 1993)) (emphasis in <u>Garry</u>).

Technically, Amanda was not a defendant in the custody proceeding. However, Amanda's present position is that she should not have been placed in DCFS's legal custody nor placed physically with the Boes. Pilar, who is acting as Amanda's representative in the present proceeding, previously took that position at the custody hearing. Thus, in essence, Amanda was in the role of an unsuccessful defendant who opposed the placements sought by the state. More importantly, the injury alleged in the Count II claim against Hall is being physically placed with the Boes subsequent to Hall's December 27, 1996 entry into this case. The December 23 juvenile court order and subsequent proceedings required that placement. Therefore, the pertinent injuries stem from the juvenile court order.

Awarding damages against Hall on the ground that Amanda should not have been placed with the Boes would be a finding that the state court order was incorrect and therefore would violate <u>Rooker-Feldman</u>. <u>See</u> <u>Maple Lanes, Inc. v. Messer</u>, 186 F.3d 823, 825 (7th Cir. 1999), <u>cert. denied</u>, 120 S. Ct. 939 (2000) (awarding damages based on the value of a lost liquor license would essentially undo the state court's revocation of the

license); <u>Homola v. McNamara</u>, 59 F.3d 647, 651 (7th Cir. 1995)
(seeking damages from deputies for enforcing arrest order is an
attempt to contest the order itself). Amanda contends the
December 23 juvenile court order would not be upset by such a
ruling because that order was a preliminary determination based
on a finding that there was probable cause to believe Amanda was
abused and the final result was to return Amanda to the Bermans.
The issue in Count II, however, is not whether Amanda should have
been taken from her home with the Bermans, but whether the site
of Amanda's temporary placement, that is with the Boes, was a
safe environment. The juvenile court implicitly, if not
explicitly, made a finding that the Boes (later, only Anita) were
safe by approving the placement with the Boes. That it was
eventually determined (after parenting classes and further
assessments) that Amanda would be returned to the Bermans does
not change the fact that the court found and ordered that Amanda
be placed with the Boes during the time period pertinent to the
claim against Hall. <u>Cf.</u> <u>Young v. Murphy</u>, 90 F.3d 1225, 1231 (7th
Cir. 1996) (claim that plaintiff was denied due process during
initial hearing at which he was found incompetent barred by
<u>Rooker-Feldman</u> even though he was eventually found to be
competent).

In a related argument, Amanda contends the December 23
juvenile court order was a nonappealable, interlocutory order and
therefore cannot be a basis for applying <u>Rooker-Feldman</u>. The
underlying basis for this argument, however, is untrue. Even if

not otherwise appealable, a party may petition the Illinois
Appellate Court for leave to appeal "from interlocutory orders
affecting the care and custody of unemancipated minors." Ill.
Sup. Ct. R. 306(a)(5). Therefore, there was an avenue for appeal
and Amanda does not argue that she did not have a reasonable
opportunity, either before the juvenile court or in a possible
appeal, to raise the issue of the appropriateness of the
placement at the Boes.

For the foregoing reasons, the Count II claim against
Hall is barred under the Rooker-Feldman doctrine and therefore
will be dismissed for lack of subject matter jurisdiction.

As to Count IV, Rooker-Feldman does not apply to the
delay claim because all the conduct underlying that claim
occurred prior to the entry of the December 23 juvenile court
order. The Count IV findings claim is different. By itself,
registration of Pilar's purported abuse is distinct from the
court's order regarding custody and has ramifications beyond
Amanda's placement. Cf. Remer, 205 F.3d at 997-98 (expulsion
from school is distinct from court injunction to stay off school
grounds). A direct challenge to the procedures underlying the
registration would not, by itself, implicate the Rooker-Feldman
doctrine. Smith v. McDonald, 1998 WL 259536 *2 (N.D. Ill. May 5,
1998). An examination of Pilar's actual claim, however, shows
that the claim made is actually a challenge to the juvenile
court's custody order.

Examination of this claim is hampered by the fact that neither side has set forth the underlying facts and defendants fail to adequately discuss the legal issues. Although, DCFS defendants seek to dismiss the Count IV findings claim as part of their motion for summary judgment, their Local Rule 56.1(a) statement does not address any of the facts underlying this claim and their brief contains only conclusory legal assertions as to why the claim should be dismissed.[18] Because DCFS defendants did not address the facts, plaintiffs regarded this aspect of the motion as being a Federal Rule of Civil Procedure Rule 12(b)(6) motion to dismiss. Therefore, instead of including facts regarding the findings claim in plaintiffs' Local Rule 56.1(b) statements, Pilar took the allegations of the complaint as true in addressing the findings claim issues conclusorily asserted by DCFS defendants in their summary judgment motion. Therefore, in determining whether <u>Rooker-Feldman</u> applies, the facts alleged in the complaint regarding the findings claim are assumed to be true.

Pilar asserts a constitutional defamation claim, claiming that Young and Threatt caused it to be falsely registered that she had abused Amanda. By itself, defamation by a public

---

[18]The law and facts underlying the claim are being considered because necessary to resolve a jurisdictional issue. Otherwise, the court would have declined to address the merits of defendants' contentions as to the findings claim because of DCFS defendants' failure to present adequate factual and legal arguments in support of their summary judgment motion as to this claim. <u>See</u> <u>Griffin v. City of Milwaukee</u>, 74 F.3d 824, 828 (7th Cir. 1996); <u>Gold v. Wolpert</u>, 876 F.2d 1327, 1333 (7th Cir. 1989).

official is not a constitutional tort because it does not implicate a protected liberty or property interest. Paul v. Davis, 424 U.S. 693, 701 (1976); Olivieri v. Rodriguez, 122 F.3d 406, 408 (7th Cir. 1997), cert. denied, 522 U.S. 1110 (1998); Townsend v. Vallas, 99 F. Supp. 2d 902, 908 (N.D. Ill. 2000). In this case, Pilar contends adequate procedures were not provided to prevent the defamation. In order for there to be a due process requirement or constitutional defamation, a liberty or property interest must be implicated. Id.; Smith, 1998 WL 259536 at *3-4. An element of a damages claim for such a constitutional violation includes a showing that the defamation caused a tangible loss, for example, the loss of an employment opportunity. Strasburger v. Board of Education, Hardin County Community Unit School District No. 1, 143 F.3d 351, 356 (7th Cir. 1998), cert. denied, 525 U.S. 1069 (1999); Townsend, 99 F. Supp. 2d at 908-09.

The cases cited by Pilar as clearly establishing the law supporting the findings claim all involve situations where a liberty interest in employment was the basis for a constitutional violation, because the plaintiffs in those cases all had employment involving children that was or could have been adversely affected by being labeled a child abuser. See Cavarretta v. DCFS, 277 Ill. App. 16, 660 N.E.2d 250, 254 (2d Dist. 1996) (teacher); Valmonte v. Bane, 18 F.3d 992, 1000-02 (2d Cir. 1994) (prospective employee in child care field); Lee TT. v. Dowling, 87 N.Y.2d 699, 664 N.E.2d 1243, 1249-50 (1996)

(psychologist at child care center of psychiatric facility and foster parents). See also Smith, 1998 WL 259536 at *4 (occupational licenses of teachers and persons in child care field); Stull v. DCFS, 239 Ill. App. 3d 325, 606 N.E.2d 786, 792-93 (5th Dist. 1992), appeal denied, 149 Ill.2d 661, 612 N.E.2d 524 (1993) (teacher); Lewis v. DCFS, 1994 WL 270265 *2-3 (N.D. Ill. June 15, 1994) (teacher). Although not cited by Pilar, Smith holds that another liberty interest that may support this type of claim is the liberty interest represented by the parent-child relationship.[19]  1998 WL 259536 at *5.  That is the liberty interest that Pilar contends was denied by the indicated finding.  Thus, in ¶ 454 of the complaint it is alleged that defendants "violated the procedural due process rights of plaintiff Pilar Berman under the Fourteenth Amendment to the United States Constitution by issuing and then maintaining an indicated report against Pilar Berman based on 'credible evidence' of abuse or neglect and then utilizing the existence of this indicated report as a basis for the continued confinement of plaintiff Hebein in the Boes' home."  Similarly, in plaintiffs' answer brief, Pilar identifies the injury that is coupled with the injury to reputation in order to support a constitutional violation as "the maintenance of Amanda in state custody after

---

[19]Since it is held that jurisdiction is lacking for the Count IV findings claim, it is inappropriate to reach the merits of that claim.  No opinion is intended to be expressed as to whether the holdings of Smith and the cases cited by Pilar are accurate statements of the law nor is any opinion expressed as to whether the constitutional rights on which the claim is based were clearly established as of January 1997.

the date of the indicated report, January 14, 1997." Plaintiffs'
Memorandum as to Renewed Motion to Dismiss at 16.

Therefore, in order to succeed on her findings claim for
damages, Pilar must show that registering the indicated finding
caused Amanda to be incorrectly placed in the custody of DCFS
after January 14. However, from January 14 until Amanda's return
to Pilar in June, Amanda was in the custody of DCFS pursuant to
the order of the juvenile court. Therefore, the Count IV
findings claim constitutes a challenge to the juvenile court
order for which this court lacks jurisdiction pursuant to the
Rooker-Feldman doctrine. The Count IV findings claim will be
dismissed for lack of subject matter jurisdiction.

Having resolved the jurisdictional issues, the merits of
the remaining claims may be addressed. In Hebein I, 37 F. Supp.
2d at 1043-44, it was held that, as of October 1996, the law was
clearly established that Amanda could not be separated from her
mother based on allegations of abuse unless there was "at least a
reasonable suspicion that abuse occurred which would justify the
degree of interference imposed." Id. at 1044. The facts
presently before the court are that Edmonds and the CCPD
defendants were informed that day care workers had reported signs
of physical abuse, that the child had indicated the perpetrator
was Amanda's stepfather, and that the child had also had bruises
the previous week. The police officers went to investigate and
also found bruises that were consistent with physical abuse and

received some corroboration from Amanda[20] that Norman had caused
the bruises. Having found confirmation of the report of abuse,
the officers had reasonable suspicion that Amanda had been
physically abused. Therefore, the officers (as well as Edmonds)
had an adequate basis for the emergency, temporary separation of
Amanda from her stepfather. Although no attempt was made to
interview the day care workers or independently investigate the
family's background, the information the officers did have was
adequate to support reasonable suspicion. Edmonds and the
officers had adequate information to support the temporary
removal of Amanda from the Berman household. It must be kept in
mind that this removal was only temporary; another person was to
be assigned to the case to conduct further investigations within
24 hours.

Plaintiffs also argue that, even if there was reasonable
suspicion of abuse by Norman, there is no evidence or contention
that Pilar, the one who actually had a familial relationship with
Amanda, had abused Amanda. Plaintiffs cite Wallis v. Spencer,
202 F.3d 1126, 1142 n.14 (9th Cir. 2000), for the proposition
that "[t]he government may not, consistent with the Constitution,
interpose itself between a fit parent and her children simply
because of the conduct—real or imagined—of the other parent."

---

[20]On defendants' summary judgment motions, it must be
assumed to be true that Amanda had limited speech capabilities
and that all the questions asked of her by the police were
leading. Still, it is undisputed that they received some
corroboration from Amanda even if it can be accorded only limited
weight.

That holding, however, does not address the situation where a
child is temporarily removed from her household for protection
from an allegedly abusive parent and not necessarily permanently
separated from the nonabusive parent who had not yet been located
at the time of removal.  Here, at the time Amanda was placed with
the Boes, Norman and Pilar had not yet been located.  Since
Norman and Pilar lived together, absent excluding Norman from the
house or arranging to have Pilar live elsewhere, taking Amanda
out of Norman's home necessitated taking Amanda from Pilar's
home.  At the time Amanda was placed with the Boes, Norman had
not yet been arrested.[21]  Based on the reasonable suspicion that
they had, the CCPD defendants and Edmonds acted reasonably in
deciding to place Amanda in a different household for her
temporary protection.  Defendants are entitled to summary
judgment on Count I.  Because the same standard and facts apply
to Count III, see Wallis, 202 F.3d at 1137 n.8, these defendants
are also entitled to summary judgment on Count III.

    The involvement of the other three DCFS defendants did
not begin until after October 11.  Therefore, the Count III
claims against Young, Threatt, and Hall must be separately
considered.  The first question is whether Young had a reasonable
suspicion that Norman had abused Amanda that would support
maintaining custody of Amanda from October 12 through
December 22.  The facts assumed to be true for present purposes

---

[21]Edmonds was not even informed that Norman and Pilar
later appeared at the station and that Norman was arrested.

are that Young delayed his investigation and then found no additional information to support that Norman had abused Amanda other than his personal observation of the bruises 19 days after October 11. But even without substantial investigation, Young had the reports of the day care workers and the police officers that Amanda had bruises consistent with abuse. He also observed Amanda's condition as of October 30 and found marks that could have been consistent with prior abuse. Additionally, he was aware that criminal charges were pending against Norman for the alleged abuse. Young had an adequate basis for the reasonable suspicion that Norman had physically abused Amanda. Like the other defendants, Young never had any information that Pilar herself represented a danger to Amanda. However, Pilar was still living with Norman and Young did not take any action to preclude Pilar from visiting Amanda at the Boes. Young did not violate Amanda's or Pilar's constitutional rights to a family relationship by placing Amanda in a home other than the one where the person reasonably suspected of abusing her lived. Since Threatt is assumed to have knowledge of the same facts as Young, the same conclusion applies to her as well. The Count III claims against Young and Threatt will be dismissed.

As to the Count III claim against Hall, plaintiffs complain that he was dilatory in following the procedures necessary to reunite Amanda and Pilar following the December 23 court hearing and order and that he failed to intervene with the Boes to ensure that Pilar would be able to exercise her

court-ordered right to visitation. Evidence is presented that
Hall failed to comply with state-mandated deadlines for
performing certain procedures. Violation of state rules,
however, are not by themselves constitutional violations. To
succeed on their Count III claim against Hall, plaintiffs must
show that Hall was unconstitutionally dilatory. Hall invokes
qualified immunity, which places the burden on plaintiffs to show
that the pertinent law is clearly established. Gossmeyer v.
McDonald, 128 F.3d 481, 495-96 (7th Cir. 1997); Hebein I, 37 F.
Supp. 2d at 1043. Plaintiffs fail to cite any case law even
supporting, let alone clearly establishing, that Hall's dilatory
conduct violates the federal Constitution. Similarly, there is
evidence that Hall did nothing to aid Pilar in exercising her
visitation rights, but no case law is cited to support that this
would be a violation of the federal Constitution. The Count III
claim against Hall will be dismissed.[22]

Next to be considered are the Count II claims against
Young and Threatt that they placed Amanda in the dangerous
environment at the Boes. Defendants contend this claim should be
dismissed because they did not have adequate knowledge of any
danger or, alternatively, because Amanda was not injured by her

_____

[22]On the motion to dismiss, the Count III claim was not
dismissed on the basis of allegations that all the defendants
lacked evidence of abuse that would justify separating Amanda
from Pilar. On summary judgment, however, the nature of the
claim against Hall has been clarified with additional factual
detail. As the previous discussion indicates, a claim against
him that he lacked evidence to support Amanda's continued
placement outside the Berman household would be barred by Rooker-
Feldman.

placement at the Boes.  Threatt also contends that she had no personal involvement, but, as previously set forth, she approved Young's actions and evidence supports that she had knowledge of the same facts as Young.

Defendants contend that they cannot be liable unless they actually knew there was a danger to Amanda.  However, as was previously held in ruling on defendants' motion to dismiss, the law was clearly established that "a child in state custody has the substantive due process right to not be placed with a custodian that the state actor knows or suspects is likely to abuse or neglect the child."  Hebein I, 37 F. Supp. 2d at 1045 (citing K.H. v. Morgan, 914 F.2d 846, 852 (7th Cir. 1990); Camp v. Gregory, 67 F.3d 1286 (7th Cir. 1995), cert. denied, 517 U.S. 1244 (1996); Taahira W. v. Travis, 908 F. Supp. 533 (N.D. Ill. 1995)).  The evidence is that Young failed to follow up on Pilar's accusations of violence on Reno's part and that follow-up investigation, which Young did not perform, would have revealed other indications of Reno's potential danger.  As plaintiffs concede, however, there is no sufficient evidence that this danger actually materialized.

On summary judgment, it must be assumed that Amanda was not physically or sexually abused by Reno.  Moreover, the injuries that have been shown, developmental delays, orthopedic problems, and post-traumatic stress have not been shown to have specifically resulted from the approximately two-month period of time for which Young and Threatt could be responsible, and all

the specific injurious conduct shown occurred subsequent to December 23, 1996.[23]  However, although weak, it can be reasonably inferred, and therefore must be so inferred on defendants' summary judgment motion, that at least some of the developmental delays and post-traumatic stress resulted from the pre-December 23 placement with the Boes.  Those injuries, however, are not the danger that would have been anticipated by Reno's reported violent conduct.  Since the injuries that resulted were not ones that would have been reasonably foreseeable based on the information Young had or should have discovered, Amanda's Count II claim against Young and Threatt cannot succeed.  Camp, 67 F.3d at 1297; Taahira, 908 F. Supp. at 940-41.  The Count II claims against Young and Threatt will be dismissed.

Still to be considered is the Count IV delay claim against Young and Threatt.  As to this claim, defendants contend plaintiffs cannot show that they suffered any harm from the delay in initiating court proceedings.  In Hebein I, it was held that the law is clearly established that a 72-day delay in instigating judicial proceedings violates the due process right to a prompt judicial hearing following the involuntary separation of a child from her custodial parent.  37 F. Supp. 2d at 1046-47.  See also Egervary v. Rooney, 80 F. Supp. 2d 491, 502-03 (E.D. Pa. 2000).

---

[23]Anita's statement to Amanda that Pilar did not love her, Reno's graphic discussions with investigators, and the dispute as to the leg braces, all occurred after December 23, 1996.

Defendants contend there was no harm because, when the hearing was eventually held on December 23, the court found that Amanda should remain in DCFS custody.

In Lossman v. Pekarske, 707 F.2d 288, 290-91 (7th Cir. 1983), it was held that a father was not entitled to damages for a delayed custody hearing because the untimely hearing that was held 12 days later determined that the father was not entitled to custody and there was no basis for finding that a timely hearing would have produced any different result. In that case, the evidence presented at the actual hearing was no different than the evidence that would have been presented at a timely hearing. See id. at 291. Similarly, in Donald v. Polk County, 836 F.2d 376, 379-80 (7th Cir. 1988), it was held that parents had no damages claim based on the seizure of their child without a predeprivation hearing because the postdeprivation hearing held three days later resulted in findings of abuse that justified an emergency seizure without a pre-seizure hearing.

Plaintiffs attempt to distinguish the present case on the ground that additional evidence would have been present had procedures been timely instituted. Specifically, they contend that a timely hearing would have been accompanied by a contemporaneous medical examination that would have shown Amanda had not been abused. Ordinarily, the burden would be on plaintiffs to show a different result was likely had proper procedures been followed. See Lossman, 707 F.2d at 291. However, assuming the lack of medical evidence can be attributed

to defendants' failure to comply with the time requirements of due process, the burden would be on defendants to show that the result of a timely hearing would have been the same as at the December 23 hearing.  See Miner v. City of Glens Falls, 999 F.2d 655, 660 (2d Cir. 1993); Patterson v. Coughlin, 905 F.2d 564, 568-70 (2d Cir. 1990); Giano v. Kelly, 2000 WL 876855 *20 (W.D.N.Y. May 16, 2000).  As previously discussed, though, the only testimony before the court is that Amanda had bruises that, at least to a nonmedical observor, appeared to have been caused by physical abuse.  On the evidence before the court, it can only be concluded that a contemporaneous medical examination also would have disclosed evidence of abuse.  Therefore, no genuine factual dispute exists that a timely hearing would have produced a different result.  Therefore, defendants are entitled to summary judgment dismissing the Count IV delay claim.

For the foregoing reasons, the state defendants are entitled to summary judgment as to all the pending claims against them.  Since the only federal claims against the Boes are based on their alleged joint action with the state defendants, the federal claims against the Boes will also be dismissed.  Since all the federal claims are being dismissed, the supplemental state law claims against the Boes will be dismissed for lack of subject matter jurisdiction.  See 28 U.S.C. § 1367(c)(3).  Because defendants were entitled to summary judgment on the delay claim, plaintiffs cannot be entitled to summary judgment on that claim. Amanda's summary judgment motion as to Count IX will not be

considered because that supplemental state law claim is being dismissed for lack of subject matter jurisdiction.

IT IS THEREFORE ORDERED that plaintiffs' motion for partial summary judgment [114-1] is denied. CCPD defendants' [117-1] and DCFS defendants' [118-1] motions for summary judgment are granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs (1) dismissing the Count II claim against Hall, the Count IV findings claim, and all supplemental state law claims without prejudice for lack of subject matter jurisdiction and (2) dismissing the remainder of plaintiffs' causes of action with prejudice.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED: AUGUST 25 , 2000